IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| AMERICAN PEGASUS SPC, acting by and through its Joint Official Liquidators, Stuart Sybersma and Michael Penner, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | Civ. Action No.:_____ |
| THE CLEAR SKIES HOLDING COMPANY, LLC, JAMES A. TORCHIA, MARC A. CELELLO, CELELLO LAW GROUP, LLC, and JARO, LLC | § § § § § | **JURY TRIAL DEMANDED** |
| Defendants. | § § | |

## ORIGINAL COMPLAINT

Plaintiff American Pegasus SPC, acting by and through its Joint Official Liquidators, Stuart Sybersma and Michael Penner, files this Original Complaint against defendants James A. Torchia, Marc A. Celello, The Clear Skies Holding Company, LLC, Celello Law Group, LLC, and Jaro, LLC (collectively, "Defendants"), and allege as follows:

### INTRODUCTION

1.     Plaintiff American Pegasus SPC ("American Pegasus" or the "Fund") was a Cayman Islands-based segregated portfolio company with portfolios that invested in sub-prime auto loans and life settlement insurance policies (*i.e.*,

viaticals) in the United States. Following an SEC investigation in 2010 into American Pegasus's investment manager—an investigation that concluded the investment manager and its principals misused Fund assets and engaged in extensive self-dealing—American Pegasus's creditors initiated liquidation proceedings before the Grand Court of the Cayman Islands.

2.      In this action, American Pegasus, acting by and through its duly-appointed joint official liquidators (the "JOLs"), seeks to avoid and recover approximately $9.37 million that its fiduciaries and Defendants caused the Fund to transfer to Defendants. American Pegasus received no consideration in exchange for the payments, which served only to benefit its investment manager and Defendants.

3.      American Pegasus seeks to avoid and recover these payments to Defendants under applicable Cayman and Georgia law. American Pegasus also asserts common law claims against Defendants for conspiring to commit fraudulent transfers, procuring breaches of fiduciary duties by American Pegasus's investment manager and fiduciaries, and unjust enrichment.

## PARTIES

4.      American Pegasus is an entity organized under the laws of the Cayman Islands and domiciled in the Cayman Islands. On July 20, 2011, the

Grand Court of the Cayman Islands, Financial Services Division ("Grand Court") entered an order directing the winding up of American Pegasus and appointing Stuart Sybersma and Michael Pearson to act as its joint official liquidators (the "Cayman Proceeding").  Michael Penner replaced Mr. Pearson as a joint official liquidator by order of the Grand Court on July 9, 2012.

5.     The JOLs filed a petition with the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court") on December 13, 2011, seeking recognition of the Cayman Proceeding as a foreign main proceeding under Chapter 15 of title 11 of the United States Code (the "Chapter 15 Petition"). The Bankruptcy Court entered an order granting the JOLs' Chapter 15 Petition on December 23, 2011 (the "Recognition Order").  The Recognition Order, among other things, recognized the Cayman Proceeding as a foreign main proceeding under 11 U.S.C. § 1517(b)(1) and the JOLs as the duly-appointed foreign representatives of American Pegasus.

6.     Defendant James A. Torchia ("Torchia") is a citizen of the State of Georgia.  Mr. Torchia may be served with process at his residence, 692 Transart Parkway, Canton, Georgia 30114-8957.

7.     Defendant Marc A. Celello ("Celello") is a citizen of the State of Georgia.  Mr. Celello may be served with process at his place of business, Celello Law Group, LLC, 9940 Highway 92, Suite 200, Woodstock, Georgia 30188.

8.     Defendant The Clear Skies Holding Company LLC ("Clear Skies") is a limited liability company organized under the laws of Georgia.  Upon information and belief, Clear Skies' principal place of business is located in Woodstock, Georgia.   Torchia and Celello are Clear Skies' only members.  Clear Skies may be served with process through its registered agent, Celello Law Group, LLC, 9940 Highway 92, Suite 200, Woodstock, Georgia 30188.

9.     Defendant Celello Law Group, LLC (the "Celello Law Group") is a limited liability company organized under the laws of Georgia.  Upon information and belief, Defendant Celello is the sole member of the Celello Law Group.  The Celello Law Group's principal place of business is in Woodstock, Georgia, and it may be served with process through its registered agent Marc Celello, 9940 Highway 92, Suite 200, Woodstock, Georgia 30188.

10.     Defendant Jaro, LLC ("Jaro") is a limited liability company organized under the laws of Georgia.  Upon information and belief, Jaro's principal place of business is located in Woodstock, Georgia.   Torchia and Robert E. Smith, a Georgia citizen, are Jaro's members.  Jaro may be served with process through its

registered agent James Torchia, 9940 Highway 92, Suite 200, Woodstock, Georgia, 30188.

<u>**JURISDICTION AND VENUE**</u>

11.     This Court has original diversity jurisdiction over this action under 28 U.S.C. § 1332(a)(2).  The amount in controversy exceeds $75,000, exclusive of interests and costs.  The Court also has original jurisdiction under 28 U.S.C. §1334(b) because this action is related to a case under chapter 15 of title 11 of the United States Code.

12.     Venue lies in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because one or more Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

<u>**BACKGROUND FACTS**</u>

***American Pegasus and Its Investment Management Team***

13.     American Pegasus was formed in June 2004 as an exempted segregated portfolio company under the laws of the Cayman Islands.  American Pegasus operated as an open-ended investment fund with multiple underlying sub-funds, or "segregated portfolios," that had subscriptions of approximately $150 million at their peak.  The segregated portfolios themselves are not separate legal entities; instead, they represent separate share classes within American Pegasus.

14.     The largest of the segregated portfolios—the American Pegasus Auto Loan Segregated Portfolio ("APAL")—invested almost $70 million in sub-prime automobile loans.  According to its offering memorandum, APAL's investment objective was "to earn a steady return by purchasing sub-prime auto loans issued in the United States."  American Pegasus's remaining assets were held in segregated portfolios that invested in life insurance settlements and by one portfolio, the American Pegasus Auto Loan Fund (Dist.) Segregated Portfolio, which invested exclusively in APAL.

15.     American Pegasus Investment Management, Inc. ("APIM"), and its successor, American Pegasus LDG, LLC ("APLDG"), provided investment management services for American Pegasus's portfolios, including APAL (the "Investment Manager").   Benjamin Chui ("Chui") founded both APIM and APLDG.  He was APIM's sole shareholder and chief executive officer from its inception, and APLDG's chief executive officer and one of its managing members until late 2010.

16.     Defendant Torchia worked for American Pegasus and/or APIM as a senior portfolio manager until he resigned on or about June 29, 2007.  According to an offering memorandum for one of American Pegasus's funds, Torchia had "specific responsibilities in the portfolio management of the life settlement and

auto loan divisions." Triffany Mok ("Mok") also served as a portfolio manager for APAL and was a member of APLDG. Charles Hall ("Hall"), a California-licensed lawyer, served as APIM and APLDG's general counsel and was one of APLDG's managing members.

17.    In addition to the Investment Manager, a board of directors also oversaw American Pegasus's operations. At the time of its liquidation, American Pegasus's board was composed of three independent directors:   Henry Carter (appointed June 1, 2011); Kathy Levinson (appointed October 2, 2010); and Isaac Hunt Jr. (appointed October 12, 2010). Chui served on American Pegasus's board of directors from August 2004 until October 2010.

18.    David Bree and Aldo Ghisletta served as independent directors from October 24, 2004 to August 25, 2005. They were replaced by Blair Brinkley and Tammy Seymour who served as independent directors from August 25, 2005 to May 24, 2010.

19.    Chui appointed his allies Mok and Pauline Lee, members of the investment management team, to serve as directors for American Pegasus beginning on May 21, 2010. Faced with a board controlled by Chui, Ms. Seymour and Mr. Brinkley resigned in May 2010. Mok later resigned as a director on October 18, 2010, and Lee resigned on March 9, 2011.

7

20.    On December 21, 2010, the Securities and Exchange Commission ("SEC") issued an Order Instituting Administrative and Cease-and-Desist Proceedings under various provisions of the Securities Act of 1933, the Security Exchange Act of 1934, the Investment Advisers Act of 1940, and the Investment Company Act of 1940 (the "Cease-and-Desist Order").  The SEC concluded that Chui, Hall, and Mok "failed to disclose conflicts of interest, misused [American Pegasus's] assets, and engaged in improper self-dealing."  The SEC censured Chui, Hall, and Mok, and barred them from acting as directors of American Pegasus or the Investment Manager.

### *The Synergy Acceptance Corp. Acquisition*

21.    Synergy Acceptance Corp. ("SAC") originated and serviced the vast majority of subprime auto loans purchased by APAL.  Defendants Torchia and Celello acted as the president and general counsel, respectively, of SAC. Additionally, Defendants Torchia and Celello controlled virtually all of SAC's stock through Defendant Clear Skies, a holding company wholly owned by Torchia and Celello.  SAC's only other shareholders, Robert E. Smith ("Smith") and David A. Kagel ("Kagel"), together held less than 0.06 percent of SAC's outstanding shares.

22.    In February 2007, Torchia offered to sell Clear Skies' controlling stake in SAC to Chui and/or American Pegasus.  At the time, Torchia proposed that Chui use APAL's cash reserves to fund the acquisition, despite knowing, as a portfolio manager for APAL, that such an acquisition fell outside the scope of APAL's stated investment objective and that SAC was insolvent.

23.    Torchia and Chui reached an agreement on the key terms of an acquisition by early May:  Chui and Hall would form a new entity, Synergy Equity LLC ("Synergy Equity"), which would acquire Clear Skies' controlling stake in SAC for approximately $20 million (the "Acquisition").  But instead of paying for the Acquisition with his own funds, Chui devised a two-step structure through which SAC would effectively finance the Acquisition with its earnings.  As outlined in a term sheet prepared by Chui (the "Term Sheet"), SAC would first re-purchase all of its shares from Clear Skies in exchange for a $20 million note payable over three years.  SAC would then issue new shares to Synergy Equity for nominal consideration, giving Chui and Hall full control over SAC.

24.    In the ensuing weeks, Celello and lawyers from his firm, the Celello Law Group, prepared the necessary documents.  The stock purchase agreements drafted by Celello's firm largely tracked the two-step structure outlined in the Term Sheet.  In two separate stock purchase agreements, SAC agreed to purchase

9

the 600 shares owned by Smith for $11,610 (the "Smith SPA") and the 999,400 shares owned by Clear Skies for $19,338,390 (the "Clear Skies SPA").  Then, in a third stock purchase agreement, SAC agreed to sell 600 shares of common stock to Synergy Equity for $11,610, thereby giving Synergy Equity full ownership and control of SAC (the "Synergy Equity SPA").

25.    The Clear Skies SPA, as contemplated by the Term Sheet, called for SAC to make payments to Clear Skies over a three-year period:  $5,096,940 within five business days of closing (the "Initial Payment") and three additional installments of $4.75 million on the first, second, and third anniversaries of the Acquisition.  To secure its payment obligation under the Clear Skies SPA, SAC further agreed to issue a non-negotiable promissory note to Clear Skies for the full purchase price.

26.    The parties closed the Acquisition at Celello's Atlanta office on June 29, 2007.  Torchia signed each of the stock purchase agreements on SAC's behalf as its president, and Torchia and Celello signed the Clear Skies SPA as Clear Skies' members.  Torchia also executed the promissory note on SAC's behalf.

27.    Although SAC had agreed to pay Clear Skies approximately $5 million shortly after the Acquisition closed, Torchia and Chui knew that SAC lacked the funds needed to make the Initial Payment.  In fact, as reflected in an

10

adversary complaint filed by SAC's bankruptcy trustee, SAC was insolvent as early as May 2006 and consistently losing money: SAC's general ledger showed negative equity of $764,385 as of May 31, 2006, and its 2006 income tax return showed that it lost almost $650,000 in 2006.

28.    To come up with the funds needed to make the Initial Payment and payments under the lease, Chui and Torchia, who remained on as SAC's president and chief executive officer, arranged for APAL to "prepay" $6 million in purported loan origination fees to SAC.  APAL wired $6 million to SAC's bank account on July 5, 2007.  SAC then wired the Initial Payment to Clear Skies' bank account at the Bank of North Georgia on or about July 13, 2007.

### *SAC's Liquidity Problems Force the Parties to Restructure the Clear Skies SPA*

29.    Just months after the Acquisition closed, SAC's continuing liquidity problems forced the parties to restructure — *i.e.*, find a new way to fund — the Acquisition.  On or about September 21, 2007, Celello, Torchia, and Hall executed a term sheet detailing their plan for restructuring the Clear Skies SPA (the "Restructuring Term Sheet").  The Restructuring Term Sheet lowered the purchase price for Clear Skies' controlling interest in SAC to $14,096,940 in exchange for an accelerated payment schedule.  Instead of leveraging SAC's non-existent profits to pay for the Acquisition, the Restructuring Term Sheet contemplated that

"Synergy Equity or Synergy Acceptance" would make the remaining payments to Clear Skies.

30.    Torchia and Celello, however, knew that Chui and Hall planned on using APAL funds to pay off Clear Skies.  In fact, in an October 4, 2007 email, Celello demanded that Hall add APAL as a party to the Restructuring Term Sheet "[s]ince Am Peg is funding the deal" and he wanted "Clear Skies to have real recourse as opposed to perceived recourse against [SAC] and/or Synergy Equity." Later that day, when Hall refused to add APAL as a party, Celello asked for a guaranty from American Pegasus because "Synergy Equity is a shell and Synergy Acceptance is not capitalized to pay $6M in January."

31.    Recognizing that adding APAL as a party posed a problem for Chui and Hall as APAL's fiduciaries, Celello promised that he and Torchia would "keep the Guarantee [sic] strictly confidential."  The parties eventually agreed to exclude APAL from the Restructuring Term Sheet, but privately understood and agreed that APAL funds would be used to make the remaining payments.

### *The Amended and Restated Stock Purchase Agreement*

32.    A few weeks later, on or about October 15, 2007, the parties executed an Amended and Restated Stock Purchase Agreement (the "Amended SPA") to formalize the restructuring of the Clear Skies SPA.  In addition to SAC and Clear

Skies—the original parties to the Clear Skies SPA—Synergy Equity, Torchia, and Celello executed the Amended SPA as parties to the restructured agreement.

33.     As agreed to in the Restructuring Term Sheet, the Amended SPA reduced the purchase price for Clear Skies' stock to $14,096,940.  The Amended SPA credited the Initial Payment of $5,096,940 against the new purchase price and required SAC, as the "Purchaser," to pay the remaining $9 million in two installments:  $3 million on October 15, 2007, and $6 million on January 5, 2008. (The parties executed an amendment on December 4, 2007, that divided the final $6 million payment into two payments, one for $2.5 million due on December 10, 2007, and a second for $3.5 million due on March 3, 2008.)  SAC also agreed to pay an additional $4.25 million to its "unsecured noteholders"—individuals that Torchia claimed held notes issued by SAC—on or before October 15, 2007.

### *Chui and Hall Misappropriate Money from APAL to Pay Clear Skies*

34.     As planned by Torchia and Celello, Chui and Hall misappropriated funds from APAL to pay Clear Skies and SAC's noteholders.  APAL's bank statements show that Chui wired a total of $13.575 million from APAL to his attorneys' escrow account at Wachovia Bank in the following amounts:  (a) $7,500,000 on October 11, 2007; (b) $2,875,000 on December 5, 2007; and (c) $3,200,000 on January 30, 2008 (the "APAL Transfers").

35.    After receiving the first APAL Transfer on October 11, 2007, Chui's attorneys, Chamberlain, Hrdlicka, White, Williams & Aughtry, P.C. ("Chamberlain"), wired approximately $4.25 million to SAC to pay off its purported noteholders.   Chamberlain then wired the majority of the remaining funds—and the majority of each subsequent APAL Transfer—directly to Clear Skies' bank account at the Bank of North Georgia.   Specifically, Chamberlain's records show that it made the following transfers to Clear Skies totaling $8.1 million:   (a) $2.7 million on October 12, 2007; (b) $2.25 million on December 6, 2007; and (c) $3.15 million on February 4, 2008 (the "Clear Skies Transfers").

36.    In connection with each Clear Skies Transfer, Chamberlain wired a portion of the funds due Clear Skies to an escrow account held by another law firm, Graham & Penman, LLP ("Graham & Penman"), to cover potential liabilities for which Clear Skies, Torchia, and Celello had indemnified SAC and Synergy Equity pursuant to the terms of the Amended SPA.   In total, Chamberlain wired $900,000 (or ten percent of the amount SAC owed Clear Skies under the SPA) into Graham & Penman's escrow account.   Upon information and belief, Graham & Penman subsequently released those funds to Clear Skies (together with the APAL and Clear Skies Transfers, the "Transfers") on or about March 22, 2008, bringing the total amount paid to Clear Skies to $9 million. Chamberlain and Graham &

Penman, which never exercised dominion or control over the funds, acted as a mere conduits through which Chui funneled money directly from APAL to Clear Skies.

37.    Clear Skies, in turn, distributed the $9 million it received from APAL to Torchia and Celello.   For example, Clear Skies distributed the following amounts to Celello or his law firm, the Celello Law Group, LLC, shortly after receiving the Clear Skies Transfers:   (a) $111,250 on October 23, 2007; (b) $125,000 on December 7, 2007; and (c) $175,000 on February 6, 2008.   Upon information and belief, and based on Torchia's own testimony, Clear Skies distributed the remaining funds (approximately $8.58 million) to Torchia.

38.    The Transfers were unquestionably fraudulent as to APAL – a fact noted by the SEC in its order dated December 21, 2010.  The Transfers fell outside APAL's disclosed investment objective—to generate returns by purchasing and holding sub-prime auto loans issued in the United States.  Yet Chui and Hall failed to disclose the Transfers to, or seek approval of the clearly related-party transactions from, American Pegasus's independent directors.  Rather, as described below, Chui and Hall went to great lengths to conceal the Transfers from American Pegasus's independent directors and investors.

39.  Moreover, APAL received no valuable consideration in connection with the Transfers.  Synergy Equity purportedly issued promissory notes to APAL in exchange for the $13.575 million APAL paid to Clear Skies (the "Notes").  The Notes, however, were nothing more than a sham.  The Notes did not require a single principal or interest payment for ten years.  And Torchia, Celello, Chui, and Hall knew that Synergy Equity could not, and would never be able to, repay the Notes:  SAC was insolvent and hemorrhaging money at the time of the Acquisition, and Synergy Equity had no other assets, operations, or revenues of its own that could be used to re-pay APAL.

40.  In fact, SAC's financial position was so dire in late 2007 that Chui and Hall were forced to loot millions more from APAL just to fund SAC's day-to-day operations.  For example, just months after APAL supposedly "prepaid" $6 million in fees to SAC to help fund the Initial Payment, Chui caused APAL to "pre-pay" another $4.5 million in fees to SAC.  The SEC's investigation also revealed that Chui and Hall wrongfully retained auto loan payments collected for APAL just to cover SAC's operating costs.

### APAL Funds Fraudulently Transferred to Jaro, LLC

41.  On or about March 17, 2008, Chui caused APAL to transfer an additional $375,000 to Chamberlain's escrow account.  Then, on or about March

16

24, 2008, Chui caused Chamberlain to wire $372,834.93 to another Torchia-controlled entity, Jaro, LLC (the "Jaro Transfer").  Like the payments APAL made to Synergy Equity in connection with the SAC acquisition, Chamberlain acted as a mere conduit through which Chui funneled additional APAL funds directly to Torchia.  The Jaro Transfer likewise fell outside APAL's disclosed investment objective—to generate returns by purchasing and holding sub-prime auto loans issued in the United States.  Yet Chui and Hall failed to disclose the Jaro Transfer to, or seek approval from, American Pegasus's independent directors.  Moreover, APAL received no valuable consideration from Jaro, LLC, Torchia, or anyone else in exchange for the Jaro Transfer.  As a result, the Jaro Transfer was fraudulent as to APAL.

### Chui and Hall Conceal the Fraudulent Transfers to Clear Skies and Jaro

42.    Chui and Hall actively concealed the fraudulent nature of the Transfers and Jaro Transfer from American Pegasus's independent directors and stakeholders for over three years.  Chui and Hall failed to disclose even the existence of the APAL Transfers until 2009, when APAL's auditors completed their audit of APAL's financial statements for the years 2007 and 2008 (the "Financial Statements").  (The Financial Statements were issued on March 16, 2009, and August 5, 2009, respectively.)  Even then, the Financial Statements

falsely represented that the APAL Transfers "were repaid in full together with accrued interest" after December 31, 2007.

43.     In reality, Chui and Hall had orchestrated yet another fraud to conceal their massive looting of APAL.  According to the Cease-and-Desist Order, SAC purchased an auto loan portfolio for $12 million in February 2009.  SAC agreed to pay the seller $2 million in cash at closing and $10 million over time, with APAL guaranteeing payment of the $10 million.  Given SAC's dire financial condition, Chui and Hall knew that APAL would eventually be required to pay the remaining $10 million owed on the portfolio.

44.     On the same day that SAC completed the purchase, Chui and Hall sold the portfolio to APAL for $38.2 million—over three times what SAC agreed to pay for it.  The majority of the portfolio, as the SEC's investigation revealed, consisted of worthless "deficiency balances," *i.e.*, the remaining balances on loans where the borrowers were already in default.  Nevertheless, Chui and Hall caused APAL to forgive the debts SAC and Synergy Equity owed it, which totaled at least $33.8 million, as payment for the portfolio, along with other purported consideration that was supposedly worth $4.4 million.

45.     The transaction was nothing more than a sham meant to conceal Chui and Hall's looting:  after APAL's auditors completed their audit in mid-2009, Chui

and Hall rescinded APAL's purchase of the worthless deficiency balances, leaving APAL still unpaid for the $13.575 million Chui and Hall misappropriated to fund the Acquisition.  Not surprisingly, Chui and Hall failed to disclose the purchase of the loan portfolio or its rescission to American Pegasus's independent directors.

46.    Chui and Hall's efforts to conceal their misappropriations from American Pegasus's independent directors and investors continued throughout 2009 and 2010.  American Pegasus's independent directors at the time, Tammy Seymour and Blair Brinkley, formed a committee of independent directors in January 2010 to investigate concerns the SEC raised about transactions between SAC and APAL.  Chui refused to cooperate or provide any information regarding the Transfers to the independent directors.  Instead, using APLDG's voting power, Chui appointed two of his cronies, Mok and Pauline Lee, to the American Pegasus board in an effort to stymie the independent directors' efforts.  Faced with a board controlled by Chui, Ms. Seymour and Mr. Brinkley resigned in May 2010.

47.    In October 2010, as the SEC's investigation into APIM and APLDG intensified, Chui resigned from the board and two new independent directors— Isaac Hunt and Kathy Levinson— were appointed in an effort to rehabilitate American Pegasus's image.  Nevertheless, Chui and the other board members

under his control continued to conceal information regarding the fraudulent nature of the APAL Transfers from the Fund's independent directors.

48.     Finally, on December 21, 2010, the SEC issued the Cease-and-Desist Order.  The order revealed, for the first time, the fraudulent nature of the APAL Transfers; Chui and Hall's elaborate efforts to conceal their looting; and Chui and Hall's multiple violations of the fiduciary duties they owed to APAL.

### Fraudulent Concealment/Tolling of Limitations

49.     Because of Chui and Hall's adverse domination of American Pegasus, SAC, and Synergy Equity—and their extensive efforts to fraudulently conceal their misappropriations—American Pegasus's independent directors did not discover, and indeed could not, with the exercise of reasonable diligence, have discovered, the fraudulent nature of the Transfers, the Jaro Transfer, or Chui and Hall's breaches of fiduciary duties until December 21, 2010, at the earliest.  Accordingly, Plaintiff's claims did not accrue until, and any and all applicable limitations periods were tolled through and including, December 21, 2010.

50.     Further, any and all limitations applicable to Plaintiff's claims against Defendant have been tolled under 11 U.S.C. §108, which extends the time period within which the JOLs can file claims that were timely as of the date they filed the Chapter 15 Petition.  Accordingly, Plaintiff may pursue any and all claims that it

could have timely filed on December 13, 2011, the date the JOLs filed the Chapter 15 Petition, until December 23, 2013, which is two years after the Bankruptcy Court entered the Recognition Order.

## CAUSES OF ACTION

### Count 1
### Disposition at an Undervalue—Cayman Companies Law §146
### (All Defendants)

51.     Plaintiff reincorporates by reference all of the allegations in each of the paragraphs above, as if fully set forth herein.

52.     Using Chamberlain and Graham & Penman's escrow accounts as conduits, Chui caused APAL to make the following dispositions of its property to Clear Skies:

      a.  $2,700,000 on or about October 12, 2007;

      b.  $2,250,000 on or about December 6, 2007;

      c.  $3,150,000 on or about February 4, 2008; and

      d.  $900,000 on or about March 22, 2008.

53.     Clear Skies, in turn, distributed the funds it received to Torchia and Celello.  Specifically, Clear Skies distributed the following amounts to Celello or his law firm, the Celello Law Group, LLC:  (a) $111,250 on October 23, 2007; (b) $125,000 on December 7, 2007; and (c) $175,000 on February 6, 2008.  Upon

21

information and belief, and based on Torchia's own testimony, Clear Skies distributed the remaining funds (approximately $8.58 million) to Torchia. Chui further caused APAL to pay approximately $372,834.93 to Jaro, LLC and/or Torchia on or about March 24, 2008.

54.    Each and every one of the foregoing dispositions was made at an undervalue. As described above, APAL did not receive consideration from Clear Skies, Torchia, Celello, Celello Law Group, Jaro, LLC, Synergy Equity, or any other person in connection with the dispositions. At a minimum, any consideration APAL received was worth significantly less than the value of the dispositions.

55.    Chui authorized the dispositions on APAL's behalf with the intention to willfully defeat APAL's obligations to its creditors and investors. The dispositions fell outside of APAL's stated investment objective, were not approved by American Pegasus's independent directors, and were purposefully concealed from American Pegasus's independent directors and investors for over three years. Moreover, because SAC was hopelessly insolvent and hemorrhaging money, Chui and Hall were well aware that APAL would never be repaid the funds they looted from APAL.

56.    Torchia and Celello knew that the dispositions were made by APAL and that APAL would never recoup those funds because, as Torchia and Celello

knew from their control of SAC, SAC was in a dire financial state. As a former senior portfolio manager for APAL, Torchia also knew that the dispositions fell outside of APAL's investment objective and constituted a fraud on APAL's creditors and investors.

57.    APAL and its creditors have been harmed by the dispositions, which were made at an undervalue and with intent to defraud APAL's creditors and investors. The dispositions should therefore be voided and set aside by the Court under section 146 of the Cayman Companies Law. Further, Plaintiff respectfully requests that the Court order Clear Skies, Torchia, Celello, Celello Law Group, and Jaro, as initial and/or subsequent transferees, to pay APAL an amount equal to the voided dispositions.

### *Count 2*
### *Fraudulent Transfer—O.C.G.A. §18-2-74(a)(1)*
### *(Torchia, Celello, Clear Skies, Celello Law Group)*

58.    Plaintiff reincorporates by reference all of the allegations in each of the paragraphs above, as if fully set forth herein.

59.    Plaintiff alternatively seeks to avoid the following transfers of Synergy Equity's property to Clear Skies as actually fraudulent under Georgia law:

   a.   $2,700,000 on or about October 12, 2007;

   b.   $2,250,000 on or about December 6, 2007;

23

    c.  $3,150,000 on or about February 4, 2008; and

    d.  $900,000 on or about March 22, 2008 (the "Synergy Transfers").

60.    Clear Skies, in turn, distributed the funds it received from Synergy Equity to Torchia and Celello.  Specifically, Clear Skies distributed the following amounts to Celello or his law firm, the Celello Law Group, LLC:  (a) $111,250 on October 23, 2007; (b) $125,000 on December 7, 2007; and (c) $175,000 on February 6, 2008.  Upon information and belief, and based on Torchia's testimony, Clear Skies distributed the remaining funds (approximately $8.58 million) to Torchia.

61.    As a result of the APAL Transfers, APAL was a creditor of Synergy Equity as of the date of each Synergy Transfer.

62.    Synergy Equity, acting through Chui and Hall, made the foregoing transfers with actual intent to hinder, delay, or defraud APAL, as evidenced by the following badges of fraud:

    a.  Synergy Equity made the transfers to an entity controlled by a former insider (*i.e.*, Torchia) of both SAC and American Pegasus;

    b.  The transfers constituted a transfer of substantially all of Synergy Equity's assets and occurred shortly after a substantial debt was incurred;

c. Synergy Equity, which acquired stock in a hopelessly insolvent company, did not receive reasonably equivalent value in connection with the transfers;

d. Synergy Equity's principals, in violation of the fiduciary duties they owed American Pegasus, concealed the APAL Transfers from American Pegasus's independent directors and investors;

e. Because SAC was insolvent and its stock worthless, Synergy Equity became insolvent after making the foregoing transfers.

63. Torchia, Celello, Clear Skies, and the Celello Law Group failed to act in good faith or provide reasonably equivalent value in connection with each of the Synergy Transfers. As evidenced by Celello's email correspondence with Hall, Torchia and Celello had actual knowledge of the source of the funds used to pay Clear Skies (*i.e.*, APAL); the nature of Chui and Hall's fraud on APAL; and Synergy Equity and SAC's insolvency as of the date of the Amended SPA and each transfer identified above. At a minimum, the circumstances surrounding the restructuring of the Clear Skies SPA and the Synergy Transfers would have placed a reasonable person on inquiry notice of Chui and Hall's fraudulent intent.

64. The Synergy Transfers are therefore actually fraudulent under O.C.G.A. §18-2-74(a)(1) and should be voided and set aside by the Court under

O.C.G.A. §18-2-77(a).  Further, Plaintiff respectfully requests that the Court order Torchia, Celello, Clear Skies, and The Celello Law Group to pay APAL an amount equal to the voided Synergy Transfers, which is the amount necessary to satisfy Plaintiff's claim.

### Count 3
### Fraudulent Transfer—O.C.G.A. §18-2-74(a)(2)
### (Torchia, Celello, Clear Skies, The Celello Law Group)

65.    Plaintiff reincorporates by reference all of the allegations in each of the paragraphs above, as if fully set forth herein.

66.    Alternatively, Plaintiff seeks to avoid the following transfers of Synergy Equity's property to Clear Skies as constructively fraudulent under Georgia law:

    a.  $2,700,000 on or about October 12, 2007;

    b.  $2,250,000 on or about December 6, 2007;

    c.  $3,150,000 on or about February 4, 2008; and

    d.  $900,000 on or about March 22, 2008 (the "Synergy Transfers").

67.    Clear Skies, in turn, distributed the funds it received from Synergy Equity to Torchia and Celello.  Specifically, Clear Skies distributed the following amounts to Celello or his law firm, the Celello Law Group, LLC:  (a) $111,250 on October 23, 2007; (b) $125,000 on December 7, 2007; and (c) $175,000 on

February 6, 2008.  Upon information and belief, and based on Torchia's own testimony, Clear Skies distributed the remaining funds (approximately $8.58 million) to Torchia.

68.    As a result of the APAL Transfers, APAL was a creditor of Synergy Equity as of the date of each Synergy Transfer.

69.    Synergy Equity did not receive reasonably equivalent value in exchange for the Synergy Transfers from Clear Skies, Torchia, or Celello. Synergy Equity was not obligated under the terms of the Amended SPA to make any payments to Clear Skies.  Further, the only consideration Synergy Equity arguably received in exchange for paying SAC's debt to Clear Skies—*i.e.*, protecting its controlling stake in SAC—was entirely worthless.  SAC was hopelessly insolvent at the time of the Synergy Transfers and continuing to lose money; so much so, that Chui and Hall continued to loot APAL to meet SAC's day-to-day operating costs.

70.    In connection with each of the foregoing transfers, Synergy Equity was engaged or was about to engage in a business transaction for which the remaining assets of Synergy Equity were unreasonably small in relation to the transaction.  Moreover, in paying Clear Skies with funds its principals looted from

APAL, Synergy Equity intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

71.    Torchia, Celello, Clear Skies, and the Celello Law Group failed to act in good faith.  As evidenced by Celello's email correspondence with Hall, Torchia and Celello had actual knowledge of the source of the funds used to pay Clear Skies; the nature of Chui and Hall's fraud on APAL; and Synergy Equity and SAC's insolvency as of the date of the Amended SPA and each transfer identified above.  At a minimum, the circumstances surrounding the restructuring of the Clear Skies SPA and the Synergy Transfers would have placed a reasonable person on inquiry notice of Chui and Hall's fraudulent intent.

72.    The Synergy Transfers are therefore constructively fraudulent under O.C.G.A. §18-2-74(a)(2)(A) and (B) and should be voided and set aside by the Court under O.C.G.A. §18-2-77(a).  Further, the Court should order Clear Skies, Torchia, and Celello to pay APAL an amount equal to the voided Synergy Transfers, which is the amount necessary to satisfy Plaintiff's claim.

### *Count 4*
### *Unlawful Civil Conspiracy*
### *(Torchia and Celello)*

73.    Plaintiff reincorporates by reference all of the allegations in each of the paragraphs above, as if fully set forth herein.

74.    Torchia and Celello joined together and acted in concert with Chui and Hall to wrongfully and unlawfully defraud APAL and its stakeholders through a scheme whereby Chui and Hall, in violation of their fiduciary duties, fraudulently transferred $9 million of APAL funds to Clear Skies.  The fraudulent transfers provided no benefit to APAL or its stakeholders and instead served to benefit only Torchia, Celello, Chui, and Hall.

75.    Torchia and Celello had knowledge of the object and purpose of, and willingly agreed to participate in, the conspiracy to fraudulently transfer APAL assets to Clear Skies.  Torchia, a former portfolio manager for APAL, knew that the transfers to Clear Skies fell outside APAL's stated investment objective.  And because Torchia and Celello controlled SAC through Clear Skies and also as officers of SAC, Torchia and Celello also knew that SAC was insolvent at the time of the transfers.  Nevertheless, Torchia proposed that Chui use APAL funds to pay for the Acquisition and worked with Chui to "arrange" for APAL to prepay $6 million to SAC so that SAC could make the Initial Payment.  And when SAC's liquidity problems forced the parties to find a new source of funding, Torchia and Celello again conspired with Chui and Hall to, among other things:   (a) fraudulently transfer APAL assets to Clear Skies as payment for SAC's obligations

under the Amended SPA; and (b) conceal the fact that APAL funds were used to pay Clear Skies.

76.   In furtherance of the conspiracy, Chui caused APAL to wire $9 million to Clear Skies, using Chamberlain and Graham & Penman's escrow accounts as conduits, in violation of Cayman and Georgia law.  American Pegasus suffered economic loss as a direct and proximate result of the fraudulent transfers to Clear Skies.

77.   The foregoing constitutes a civil conspiracy that directly and proximately caused American Pegasus to suffer millions of dollars in damages.  As Chui and Hall's co-conspirators, Torchia and Celello should be held jointly and severally liable for any and all harm suffered by American Pegasus.

### Procuring Breach of Fiduciary Duty
### (Torchia and Celello)

78.   Plaintiff reincorporates by reference all of the allegations in each of the paragraphs above, as if fully set forth herein.

79.   Chui, as a principal of the Investment Manager and director of American Pegasus, and Hall, as the general counsel of the Investment Manager and a principal of APLDG, owed fiduciary duties to American Pegasus.  Chui and Hall breached their fiduciary duties by, among other things, misappropriating and fraudulently transferring APAL funds to Clear Skies and entering into related-party

transactions on commercially unreasonable terms without seeking approval from American Pegasus's independent directors.

80.    Torchia and Celello actively assisted, advised, facilitated, and counseled the breaches of fiduciary duties perpetrated by Chui and Hall, including the misappropriation and fraudulent transfer of APAL funds to Clear Skies. Torchia and Celello, the president and general counsel of SAC, respectively, and Clear Skies' sole members, induced Chui and Hall to restructure the Acquisition using APAL funds to secure their own payout.  Torchia and Celello further assisted Chui and Hall in concealing their misappropriations.

81.    Accordingly, Torchia and Celello, through improper action and/or wrongful conduct and without privilege, acted to procure multiple breaches of Chui and Hall's fiduciary duties to American Pegasus.  Torchia and Celello acted with knowledge that Chui and Hall owed fiduciary duties to American Pegasus, that the Transfers violated APAL's stated investment objective, and that the Transfers constituted a breach of Chui and Hall's fiduciary duties to American Pegasus.  Torchia and Celello acted purposely and with malice and the intent to injure American Pegasus.

82. Torchia and Celello's tortious conduct set forth herein constitutes the tort of procuring a breach of fiduciary duty, and proximately caused American Pegasus to suffer millions of dollars in damages.

### Unjust Enrichment
### (All Defendants)

83. Plaintiff reincorporates by reference all of the allegations in each of the paragraphs above, as if fully set forth herein.

84. Defendants have been unjustly enriched by their tortious conduct as described herein.

85. American Pegasus has suffered and continues to suffer substantial damages as a result of Defendants' wrongful conduct and have acquired substantial profits and/or payments to which they are not entitled. Accordingly, Plaintiff is entitled to recover the amount by which Defendants have been unjustly enriched, including the funds and any profits earned on the funds that properly belong to American Pegasus.

### NOTICE OF INTENT TO RAISE ISSUES UNDER FOREIGN LAW

86. Pursuant to Rule 44.1 of the Federal Rules of Civil Procedure, the JOLs hereby give notice of their intent to raise issues under Cayman law, including but not limited to, their claim for the avoidance of dispositions made at an undervalue pursuant to section 146 of Cayman Companies Law. The JOLs intend

to offer expert testimony, documents, and other relevant material or sources to the Court to determine the foreign law at issue.

## PRAYER

THEREFORE, Plaintiff American Pegasus SPC, acting by and through its Joint Official Liquidators, Stuart Sybersma and Michael Penner, request that judgment be entered in its favor and against Defendants The Clear Skies Holding Company, LLC, James A. Torchia, Marc A. Celello, Celello Law Group LLC, and Jaro, LLC as follows:

(a) Void and/or set aside the Transfers and award an amount equal to the Transfers to Plaintiff;

(b) Void and/or set aside the Jaro Transfer and award an amount equal to the Jaro Transfer to Plaintiff;

(c) Award Plaintiff compensatory, consequential, and/or monetary damages in an amount to be determined by a jury;

(c) Disgorge all fees and other monies unjustly obtained by Defendant and award such fees and other monies to Plaintiff;

(d) Award Plaintiff multiple, special, punitive, and/or exemplary damages in an amount to be determined by a jury;

(e) Award Plaintiff its reasonable and necessary attorneys' and paralegal fees, together with all costs of court;

(f) Award Plaintiff prejudgment and post-judgment interest at the highest rates allowed by law or equity; and

(g)     Grant Plaintiff such other and further relief, at law or in equity, as this Court deems just and proper.

Dated:  September 11, 2013                     Respectfully submitted,


/s/  William S. Sugden
William S. Sugden
Georgia Bar No. 690790
Heather Byrd Asher
Georgia Bar No. 139022
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Tel:  404-881-7000
Fax:  404-881-7777
will.sugden@alston.com
heather.asher@alston.com


P. Jason Collins (*pro hac* forthcoming)
Nathaniel J. Palmer (*pro hac* forthcoming)
REID COLLINS & TSAI LLP
1301 Capital of Texas Highway, Suite C300
Austin, Texas 78746
Tel:  512-647-6100
Fax:  512-647-6129

*Counsel for Plaintiff American Pegasus SPC*

34

## <u>CERTIFICATION OF FONT</u>

This certifies that pursuant to LR 5.1, N.D., GA, the above and foregoing has been prepared using Times New Roman font, 14 point.

This 11th day of September 2013.

/s/  William S. Sugden
William S. Sugden
Georgia Bar No. 690790
Heather Byrd Asher
Georgia Bar No. 139022
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Tel:  404-881-7000
Fax:  404-881-7777
will.sugden@alston.com
heather.asher@alston.com